ROBERT W. HANSEN and JEAN HANSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hansen v. Commissioner
Docket No. 9163-72.
United States Tax Court
T.C. Memo 1975-343; 1975 Tax Ct. Memo LEXIS 31; 34 T.C.M. (CCH) 1488; T.C.M. (RIA) 750343; November 17, 1975, Filed *32 Robert W. Hansen, pro se. C. Garold Sims, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' income taxes of $717.53 for 1967, $440.60 for 1968, $340.18 for 1969, and $463.60 for 1970. Robert W. Hansen (hereinafter petitioner) has made a number of concessions and so the only issue remaining is whether payments petitioner received for removal of bentonite were taxable as ordinary income or capital gains. FINDINGS OF FACT Some facts and exhibits were stipulated and are found accordingly. Petitioner and his wife, Jean Hansen, lived in Glasgow, Montana, when they filed joint 1967, 1968, 1969, and 1970 income tax returns at the Western Service Center, Internal Revenue Service, Ogden, Utah, and when they filed their petition in this case. Petitioner received a bachelor of science degree in industrial chemistry in 1946 from Bozeman College. In 1949, he began geochemical prospecting, leading to discovery in 1955 of an undetermined amount of bentonite on public lands. Bentonite is a soft, porous, moisture-absorbing volcanic ash used in production of steel and as an additive in certain *33 oil well drilling muds. In 1958, petitioner, his wife, and six others entered into a joint venture, Brazil Creek Bentonite Company (hereinafter Brazil), to exploit the bentonite petitioner found. Brazil filed 100 mining claims to bentonite deposits in Montana, hoping to sell the marketable bentonite, if any, on its claims. In 1965, Brazil granted Archer-Daniels-Midland Company (hereinafter ADM) an option to purchase the bentonite on its claims. This option provided, in part, as follows: 1. Brazil does hereby grant an option to ADM to purchase all of said bentonite in place. Said option is granted for the consideration that ADM at its expense agrees to drill and explore said claims to determine the extent of marketable bentonite thereon, and this option shall expire October 31, 1966. * * * At any time prior to October 31, 1966, ADM may exercise its option to purchase all of the marketable bentonite in place, at 40" per ton in its natural or field dried state, subject to the following terms and conditions to-wit: 2. After the properties have been drilled, ADM shall determine whether or not to exercise this option, and in the event ADM elects to exercise the option, it shall, prior *34 to October 31, 1966, give written notice thereof to Brazil * * * and it shall at the same time pay to Brazil, the sum of $50,000.00, and thereafter, on the first anniversary date of the exercise of this option, ADM shall pay Brazil $15,000.00; a like sum shall be payable on the second and third anniversary of the exercise of this option, and on each anniversary date thereafter, ADM shall pay to Brazil, the sum of $24,000.00. All of the herein described payments shall be advance payments. ADM has the privilege of removing, without payment, an amount of bentonite at 40" per ton, equivalent to the advance cumulative payments already made, and all mined in excess of the cumulative advance payment shall be paid for by ADM, at the rate of 40" per ton, in its natural or field dried state, said additional 40" per ton payments shall be paid as they become due at the end of each calendar quarter. 3. It is understood and agreed by and between the parties that this option agreement covers all the yellow marketable bentonite found upon the properties, with the privilege to ADM to take any marketable bentonite under this agreement it so desires. ADM shall make the sole determination as to the *35 quantity of marketable bentonite on the properties and of what bentonite shall be taken and paid for, and this determination shall be final. * * * Ashland Oil & Refining Company acquired all the interests of ADM. Federal Bentonite Company, in turn, acquired all the interests of Ashland. ADM and its successors paid the following royalties to Brazil: Date
Amount
March 8, 1967
$50,000
October 27, 1967
15,000
October 27, 1968
15,000
October 27, 1969
15,000
October 27, 1970
24,000
From 1967 through 1970, the years in question, petitioner had a 31-2/3 percent interest in the distribution of Brazil's profits; he received the following amounts: Year
Amount [1]
1967
$17,666.66
1968
9,600.00
1969
4,750.00
1970
7,594.53
ULTIMATE FINDING OF FACT Brazil did not part with its entire interest in the bentonite claims transferred to ADM and its successors. OPINION Petitioner, his wife, and six others formed Brazil, a joint venture, to exploit bentonite deposits *36 which petitioner had found. Brazil filed mining claims on this bentonite and gave ADM and its successors in interest an option to mine and purchase the bentonite. They paid Brazil $119,000 between March of 1967 and October of 1970 and petitioner, as a joint venturer in Brazil, received a share of these payments: Year
Amount
1967
$17,666.66
1968
9,600.00
1969
4,750.00
1970
7,594.53
Petitioner contends that the payments are capital gains and respondent that they are ordinary income. [2] The result depends on the character of the payments in the hands of Brazil, for they remained the same in the hands of petitioner. We reach this conclusion, as to the character of the income, after examining a number of Code [3] sections. Section 7701(a)(2) included a joint venture in the definition of partnership. Sections *37 61(a)(13) and 702(c) required that a partner include in income his distributive share of partnership income. Section 702(b) required, in part, that the character of any item of income of this distributive share be determined as if such item were received directly by the partners from the source. Thus if Brazil received ordinary income, petitioner, when he, in turn, received his share, also received ordinary income. Fortunately, the test for determining whether Brazil received ordinary income or capital gains is well defined. As stated in : where the owner does not part with his entire interest in the deposits until removed or where he does not sell part of his property "in place," but in effect merely enters into a lease for the exploitation of his land reserving a royalty with respect to the materials extracted * * * the payments received from exploitation of the deposits are taxable as ordinary income.[4] See also . The reasoning behind this holding is quite logical: if *38 the owner of the deposit had extracted it himself, there would be no serious dispute that the profit would be ordinary income rather than capital gain. Merely because the owner permits another to extract the deposit for him does not change the character of the income. . *39 We therefore must examine Brazil's option to ADM and its successors to determine whether it parted with its entire interest in the bentonite or merely entered into a lease for its exploitation. Paragraph one of the option granted ADM and its successors the right "to purchase all of said bentonite in place." Although this paragraph is couched in terms of conveyance, the essence of an agreement "is determined not by subtleties of draftsmanship but by * * * total effect." . In paragraph two, the parties did not base the payments upon a flat price for the sale of the bentonite "in place" but rather calculated them on the amount of bentonite removed. Brazil thus did not part with its entire interest; it reserved "a royalty with respect to the materials extracted * * *." . This was true of the advance payments as well as those made after the bentonite was removed. The advance payment of $50,000, for example, merely gave ADM and its successors the right to remove the first 125,000 tons of bentonite at 40" per ton. Such a payment has been deemed a guaranteed *40 minimum royalty. . See also . Paragraph three emphasizes further that Brazil did not part with its entire interest in the bentonite, for ADM and its successors were the sole judges of the amount of bentonite which they would take and pay for. We find that Brazil did not part with its entire interest in the bentonite claims transferred to ADM and its successors. Rather, it entered into a lease for exploitation of the bentonite, reserving a royalty with respect to the minerals extracted. Payments it received were subject to treatment as ordinary income. Since the payments in the hands of petitioner were of the same character as in the hands of Brazil, we accordingly hold that the payments he received from Brazil are taxable as ordinary income. In light of our holding and because of petitioner's concessions on other issues, Decision will be entered for the respondent.
Footnotes
1. The record does not reveal why the amount petitioner received each year from Brazil was not 31-2/3 percent of the amount that Brazil received from ADM and its successors.↩
2. Petitioner, who represented himself, argues that he should receive capital gain treatment because his discovery of the bentonite was a "trade secret" and that the profit from the sale of his "trade secret" was capital gain. We think his argument is misplaced; knowledge of where natural deposits exist does not rise to the level of a trade secret.↩
3. References are to the Internal Revenue Code of 1954 as in effect in the years in question.↩
4. See at 458: In a long line of decisions beginning with * * *, the underlying principles governing the income tax consequences involving natural deposits have been set forth by the Supreme Court; * * *; * * *; * * *. Under these decisions notwithstanding the terminology of the contract the transaction is to be considered a sale if the consideration is payable to the grantor without respect to the production and sale of the mineral. On the other hand, regardless of the wording of the contract, where the consideration payable to grantor depends solely↩ upon the extraction and sale of mineral, the owner is said to retain an economic interest, and therefore his proceeds from the transaction are to be reported as regular income, subject under certain conditions to a deduction of a percentage depreciation allowance.